IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

**ENTERED**
**02/07/2013**

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 12–33338 |
| **AFI SERVICES, LLC,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |
| | § | |

| | | |
|---|---|---|
| **JOHN QUINLAN,** | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | |
| | § | **Adversary No. 12–03303** |
| **AFI SERVICES, LLC, JAMES FALES,** | § | |
| **OKIN & KILMER, LLP, and CHRIS** | § | |
| **ADAMS,** | § | |
| Defendants. | § | |

## MEMORANDUM OPINION REGARDING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND TRUSTEE'S COUNTER-MOTION FOR SUMMARY JUDGMENT
[Adv. Doc. Nos. 45 & 52]

### I.   INTRODUCTION

In the instant adversary proceeding, Plaintiff John Quinlan (Quinlan) seeks the return of

$1.0 million, which he placed into an escrow account (the Escrow Account) "on behalf of"

Debtor AFI Services, LLC (the Debtor) after entering into a contractual agreement with the

Debtor. Quinlan has filed a motion for partial summary judgment seeking: (1) a declaration that

the bankruptcy estate has no interest in the $1.0 million; and (2) a return of these funds to him.

The Chapter 7 Trustee, Eva S. Engelhart (the Trustee),[1] opposes this motion and has, in turn,

---

[1] Eva S. Engelhart was appointed as the Chapter 11 Trustee for the Debtor's estate in the Main Case. [Main Case Doc. No. 76]. The Trustee then sought appointment of special litigation counsel, Charles Vetham (Special Counsel). [Main Case Doc. No. 97]. Subsequently, Special Counsel (on the Trustee's behalf) filed the Counter-Motion to Plaintiff's Motion for Partial Summary Judgment. [Adv. Doc. No. 52]. After Special Counsel filed the Counter-Motion, the Debtor's case was converted from a Chapter 11 to a Chapter 7. [Main Case Doc. No. 114]. The Trustee appointed while the case was in a Chapter 11 remained the Trustee after the case was converted to a Chapter 7. The Trustee therefore brings the Counter-Motion on behalf of the Debtor's Chapter 7 estate.

filed a counter-motion for summary judgment arguing that the $1.0 million is property of the Debtor's estate (the Counter-Motion).

This Court must determine whether the $1.0 million is property of the bankruptcy estate pursuant to 11 U.S.C. § 541. To analyze this issue, the Court must address the terms of a different contract—an Agreement of Purchase and Sale between Wells Fargo, N.A. and the Debtor (the PSA). The PSA established the Escrow Account, and though Quinlan was not a party to the PSA, by depositing the $1.0 million into the Escrow Account, the $1.0 million is governed by the PSA's terms.

Based upon the entire record, the Court now makes the following written Findings of Fact and Conclusions of Law pursuant to FED. R. CIV. P. 52, as incorporated into adversary proceedings by FED. R. BANKR. P. 7052. To the extent that any Finding of Fact is construed to be a Conclusion of Law, it is adopted as such. To the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such. The Court reserves the right to make any additional Findings and Conclusions as may be necessary or as requested by any party.

For the reasons set forth herein, this Court concludes that the $1.0 million at issue is property of the Debtor's bankruptcy estate. Accordingly, Quinlan's Motion for Partial Summary Judgment is denied in its entirety, and the Counter-Motion is granted in its entirety.

## II. FINDINGS OF FACT

1. On November 28, 2011, the Debtor, as purchaser, and Wells Fargo Bank, N.A.,[2] as seller (the Seller), entered into an Agreement of Purchase and Sale (the PSA) of the City View Apartments complex, comprising approximately 2,712 apartment units located in Houston, Texas (the Property). [Adv. Doc. No. 58, p. 2]; [Def.'s Ex. No. 10].

---

[2] As trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities 2006-CIBC16, Commercial Mortgage Pass-Through Certificates, Series 2006-CIBC16.

2.  Section 32 of the PSA is entitled "**Escrow Agreement**," and contains the following relevant

terms:

>  A.    The Title Company agrees to deposit the Earnest Money in an interest
>  bearing account . . . and to hold and disburse said funds, and any interest earned
>  thereon, as hereinafter provided.  **Upon written notification from Seller or
>  Purchaser in accordance with the terms of this Agreement, the Title
>  Company shall release the funds in accordance with and pursuant to the
>  written instructions.**  In the event of a dispute between any of the parties hereto
>  sufficient in the sole discretion of the Title Company to justify its doing so, the
>  Title Company shall be entitled to tender upon the registry or custody of any court
>  of competent jurisdiction all money or property in its hands hold under the terms
>  of this Agreement, together with such legal pleading as it deems appropriate, and
>  thereupon as discharged.

[Def.'s Ex. No. 10, p. 20] (emphasis added).  The PSA designates Stewart Title Company as

the title company (the Title Company) [Def.'s Ex. No. 10, p. 2].  Mark LaRocca was the

Commercial Escrow Officer (the Escrow Officer) in charge of the escrow account at the Title

Company (the Escrow Agreement).  [Adv. Doc. No. 58, p. 3].

3.  Section 10 of the PSA, entitled "**Notices**," lists five ways in which notice may be given by

one party to another.  [Def.'s Ex. No. 10, p. 13].  Specifically, notice may be given via:  (1)

hand delivery at the address set forth for that party in the PSA; (2) hand delivery at the

closing; (3) U.S. mail, certified with return receipt requested, addressed to the party at the

address set forth for that party in the PSA; (4) Federal Express Overnight Delivery or another

reputable overnight carrier for next day delivery to the party at the address set forth for that

party in the PSA; or (5) facsimile transmission to the party at the telecopy number set forth

for that party in the PSA, provided that such transmission is confirmed by telephone on the

date of such transmission. [Def.'s Ex. No. 10, p. 13].  Part B of Section 10 lists mailing

addresses, telephone numbers, fax numbers, and e-mail addresses for the Seller and its

attorney and the Debtor and its attorney.  [*Id.* at p. 13–14].  Although e-mail addresses are listed, the "Notices" section does <u>not</u> provide for notice by e-mail.

4.  The PSA also includes a merger clause, which states that the PSA contains the entire agreement of the parties and prohibits modifications "unless set forth in a document executed by such parties or a duly authorized agent, officer or representative thereof."  [Def.'s Ex. No. 10, p. 14].

5.  The Debtor terminated the PSA pursuant to a letter from the Debtor to the Seller dated December 28, 2011.  *See* [Def.'s Ex. No. 15].

6.  On December 29, 2011, the Debtor and the Seller entered into a Reinstatement and First Amendment to Agreement of Purchase and Sale (the First Amendment to the PSA), wherein the parties agreed, among other things, to reinstate the PSA and move the Scheduled Closing Date[3] to February 10, 2012.  [Adv. Doc. No. 58, p. 2]; [Def.'s Ex. No. 15].

7.  On January 6, 2012, the Debtor and the Seller entered into a Second Amendment to Agreement of Purchase and Sale (the Second Amendment to the PSA), wherein the parties agreed, among other things, to a reduction of the purchase price of the Property.  [Adv. Doc. No. 58, p. 2]; [Def.'s Ex. No. 16].

8.  On March 5, 2012, the Debtor and the Seller entered into a Third Amendment to Agreement of Purchase and Sale (the Third Amendment to the PSA).  [Adv. Doc. No. 58, p. 2]; [Def.'s Ex. No. 17].  Prior to the execution of the Third Amendment, the Debtor had exercised its right pursuant to the PSA to extend the Scheduled Closing Date from February 10, 2012 to

---

[3] The PSA defines "Scheduled Closing Date" as "as soon as possible, but no later than thirty (30) Business Days following the expiration of the Review Period . . . unless such date is changed in writing by Seller and Purchaser." The "Review Period," in turn, is defined as "5:00 p.m. Dallas, Texas time on the twenty-first (21st) Business Day" after November 28, 2011, which is when the PSA was executed.  Therefore, under the PSA, assuming the parties did not agree in writing to change the date of the Review Period, the Review Period ended December 28, 2011, and the parties had until February 10, 2012, at the latest, to close.

March 5, 2012, and had paid earnest money associated with exercising this right. [Def.'s Ex. No. 17, p. 1]. The Third Amendment to the PSA increased the purchase price and further extended the Scheduled Closing Date to April 30, 2012. [Adv. Doc. No. 58, p. 2]; [Def.'s Ex. No. 17, p. 2].

9.  Thereafter, the Debtor and the Seller began negotiating for another extension of the Scheduled Closing Date, and drafted and circulated a Fourth Amendment to Agreement of Purchase and Sale (the Fourth Amendment to the PSA). [Pl.'s Ex. F, p. 4]. As consideration for the additional extension, the Debtor was to deposit an additional $1.0 million into the Escrow Account at the Title Company (i.e., in addition to any amounts which the Debtor had previously paid in connection with entering into the PSA and extending the Scheduled Closing Date). [*Id.*]; *see also* [Def.'s Ex. No. 18] (referring to this payment as a $500,000 deposit for an initial 30 day extension and $500,000 for an additional 30 day extension). Although the Fourth Amendment to the PSA was circulated for execution by the parties it was never executed.

10. On April 27, 2012, Quinlan and James Fales (Fales), as "authorized signatory" on behalf of the Debtor, executed a document entitled "Summerlin Properties, LLC - Agreement to Enter into Joint Venture" (the JVA). [Adv. Doc. No. 58, p. 2]; [Pl.'s Ex. A]. The purpose of the JVA was "to establish the principal terms and conditions on and subject to which . . . [the Debtor] and an entity controlled by [Quinlan] shall form a single purpose entity to acquire the Property." [Adv. Doc. No. 52-3, p. 1]. The terms of the JVA provided that:

> Contemporaneously with the execution of this Agreement, Quinlan shall wire transfer to Seller, on behalf of AFIS [i.e., the Debtor] $1,000,000 as contemplated by that certain Fourth Amendment to Agreement of Purchase and Sale to be entered into on the date hereof. AFIS [i.e., the Debtor] will form a single purpose entity, Summerlin Properties, LLC or other name approved by both parties

("Summerlin") to acquire the Property.  Upon the formation of Summerlin, AFIS [i.e., the Debtor] shall assign the Contract to Summerlin.

[*Id.*].  No terms of the PSA were altered in connection with, or as a result of, the execution of the JVA.

11. Also on April 27, 2012, the Seller sent correspondence to the Debtor stating that it "is fully prepared and intends to close the Sale on April 30, and expects Purchaser [i.e., the Debtor] to close the Sale on April 30."[4]  [Adv. Doc. No. 58, p. 2]; [Adv. Doc. No. 1, p. 6–7]; [Adv. Doc. No. 41, p. 4, ¶ 33].

12. On April 30, 2012, at 10:25 a.m., Quinlan wire transferred $1.0 million to the Escrow Account at the Title Company.  [Adv. Doc. No. 58, p. 3].  As discussed previously in Finding of Fact No. 2, the Escrow Account had been established by the Debtor and the Seller in the PSA, and was governed by the terms of the PSA.  Quinlan's $1.0 million wire transfer was made "on behalf of AFIS" [i.e., the Debtor], but contained no further qualifications, limitations, restrictions, or reservations.  [Adv. Doc. No. 52-3, p. 1].

13. On April 30, 2012, at 1:22 p.m., Andrew Rooker, attorney for the Seller (the Seller's Attorney), sent a message to the Escrow Officer, stating, "Marc [i.e., the Escrow Officer], please cause this additional earnest money to be wired back to the sender as soon as possible."[5]  [Pl.'s Ex. No. C at 2].  A copy of this message was also sent to Jason Peters, the corporate attorney for the Debtor (the Debtor's Corporate Attorney).  This message was sent via e-mail, contrary to Part B of Section 10 of the PSA, which does not include e-mail as a

---

[4] This correspondence was not introduced as an exhibit.  However, both parties stipulate to the existence and content of this document; therefore, the Court makes this Finding of Fact.

[5] In connection with entering into the PSA and exercising its right to extend the Scheduled Closing Date, the Debtor had deposited earnest money with the Title Company.  [Adv. Doc. No. 52-2, p. 2]; [Def.'s Ex. No. 17, p. 1]; [Finding of Fact No. 8].

form of notice.  Accordingly, the Court finds that the Debtor's Corporate Attorney and the Escrow Officer did not receive proper notice of this instruction.

14. The Escrow Officer did not wire the money back to the sender (i.e., Quinlan).  [Def.'s Ex. No. 14 p. 1].

15. On April 30, 2012 at 8:34 p.m., the Debtor filed a Chapter 11 petition.  [Main Case Doc. No. 1].

16. At the time the Debtor filed the Chapter 11 petition, the $1.0 million that Quinlan had wired to the Title Company was still in the Escrow Account.  *See* [Def.'s Ex. No. 12] (showing that as of June 7, 2012 the Title Company still controlled the funds).

17. On June 7, 2012 at 9:50 a.m., the Escrow Officer emailed the Debtor's Corporate Attorney, and requested instructions as to what to do with the $1.0 million, plus any interest earned thereon.  [Adv. Doc. No. 58, p. 3]; [Def.'s Ex. No. 12].

18. On June 7, 2012 at 1:47 p.m., Chris Adams, the Debtor's bankruptcy attorney and a partner at Okin Adams & Kilmer, LLP (OAKLLP), emailed the Escrow Officer[6] and stated, "I believe the safest way to handle the return of funds is to wire these funds to my firm's IOLTA trust account."  [Adv. Doc. No. 58, p. 3]; [Def.'s Ex. No. 13].

19. On June 8, 2012, the Title Company wired the funds to OAKLLP's IOLTA trust account.  [Adv. Doc. No. 58, p. 3].  Thereafter, the $1.0 million was deposited into the registry of the Court.

20. On July 11, 2012, Quinlan commenced the instant adversary proceeding by filing a complaint against the Debtor, Fales, OAKLLP, and Chris Adams[7] for a declaratory judgment

---

[6] Though not in the record, the Debtor's Corporate Attorney, Jason Peters, apparently forwarded the Escrow Officer's e-mail to the Debtor's bankruptcy attorney, Chris Adams, seeking his advice as to how to respond.

[7] Chris Adams and OAKLLP are no longer parties to this suit.  [Adv. Doc. No. 32].

that:  (1) the $1.0 million he wired to the Escrow Account is not property of the bankruptcy estate; (2) the Debtor's estate has no interest whatsoever in the $1.0 million; and (3) he (i.e., Quinlan) is the sole owner of the $1.0 million.  [Adv. Doc. No. 1]; [Adv. Doc. No. 58, p. 3–4].

21. On October 5, 2012, Quinlan filed his Motion for Partial Summary Judgment that the bankruptcy estate has no interest in the $1.0 million held in the Registry of the Court (the Motion for Partial Summary Judgment).  [Adv. Doc. No. 45].

22. On October 26, 2012, the Trustee filed the Counter-Motion arguing that the $1.0 million held in the Registry of the Court is an asset of the bankruptcy estate.  [Adv. Doc. No. 52].

23. On October 31, 2012 and November 6, 2012, the Court held hearings on the Motion for Partial Summary Judgment and the Counter-Motion.  The Court admitted exhibits and listened to oral arguments, and then took the matter under advisement.  The Court now explains its ruling in this Memorandum Opinion.

### III. CONCLUSIONS OF LAW

**A.     Jurisdiction and Venue**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(b) and 157(a). This particular dispute is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), and the general "catch-all" language of 28 U.S.C. § 157(b)(2). *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under section 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case.").  This proceeding is core because the issues affect the property of the estate and the amount of assets available for distribution. Venue is proper pursuant to 28 U.S.C. § 1409(a).

**B.      Constitutional Authority to Enter a Final Order**

The Supreme Court's decision in *Stern v. Marshall* recognized certain limitations on bankruptcy courts' authority to enter final orders. 131 S. Ct. 2594 (2011). Therefore, this Court has a duty to question its constitutional authority to enter a final order for any matter brought before it. The Court concludes that the facts in the pending suit are distinguishable from those in *Stern*, and that this Court has the authority to enter a final judgment. In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant. *Id.* The dispute at bar, on the other hand, despite requiring the application of state law, arises from an express bankruptcy provision: 11 U.S.C. § 541. Moreover, unlike *Stern*, application of state law to this provision will necessarily determine whether Quinlan has a claim against the bankruptcy estate. This suit is therefore easily distinguishable from the dispute in *Stern*, which leads this Court to conclude that it is constitutionally authorized to enter a final judgment in this suit.

**C.      The Instant Motions are Ripe for Summary Judgment**

In the instant adversary proceeding, the issue is whether the $1.0 million, which Quinlan placed in escrow "on behalf of" the Debtor, is property of the bankruptcy estate pursuant to 11 U.S.C. § 541. The Fifth Circuit has held that the question of whether an asset is property of the estate is a "legal determination which frequently entails complex analyses involving a number of legal elements and a variety of facts." *Brown v. Chesnut (In re Chesnut)*, 422 F.3d 298, 303 (5th Cir. 2005). Although the determination of this issue is dependent on the facts of the suit, here the parties have stipulated to material facts related to the Motion for Partial Summary Judgment and the Counter-Motion. As there are no other material facts in dispute, this issue presents solely a question of law and is ripe for summary judgment. FED. R. CIV. P. 56 (made applicable by Fed. R. Bankr. P. 7056).

**D.      The $1.0 Million is Property of the Chapter 7 Bankruptcy Estate**

Despite Quinlan's protests, the PSA governs the disposition of the $1.0 million in the Escrow Account.[8] Consequently, these funds constitute property of the Chapter 7 estate.

1.  Property of the Bankruptcy Estate is Defined under Texas Law

Property of the estate is defined broadly and encompasses "all legal or equitable interests of the debtor in property as of the commencement of the case . . . wherever located and by whomever held." 11 U.S.C. § 541(a).  Despite this broad definition, the estate does not receive more rights than those that the debtor has in property as of the commencement of the case—in other words, if a debtor's interest in property is limited at the time of filing, the estate's right in the property is also so limited.  *E.g., In re Dolphin Titan Int'l, Inc.*, 93 B.R. 508, 512 (Bankr. S.D. Tex. 1988) (citing *Bank of Marin v. England*, 385 U.S. 99 (1966); *N.S. Garrott & Sons v. Union Planters National Bank of Memphis (In re N.S. Garrott & Sons)*, 772 F.2d 462, 466 (8th Cir. 1985); 5-541 Collier on Bankruptcy § 541.03.  The nature and extent of a debtor's interest in property is determined by reference to applicable state law—here, the laws of the State of Texas. *Butner v. United States*, 440 U.S. 48, 55 (1979).

2.  Under Texas Law, the Seller and the Debtor Created an Escrow Account

In Texas, as a threshold matter, the Court must analyze whether the Seller and the Debtor created an escrow account arrangement.  "Under Texas law, an escrow is created *only* when the parties come to a clear and definite agreement directing that the funds be deposited with a third

---

[8] Quinlan requested that the Court take judicial notice of the Trustee's statement that "[T]he *Trustee* has reviewed the Purchase and Sale Agreement, as amended, and *recognizes that Wells Fargo had valid contractual rights to retain the Debtor's earnest money.*" [Main Case Doc. No. 174] (emphasis added); [Adv. Doc. No. 74].  This statement, however, does not refer to the $1.0 million at issue in the suit at bar, nor does this statement have any effect on the Court's ruling.  The earnest money referenced by the Trustee in this statement is the non-refundable $200,000.00 placed into escrow by the Debtor.  The subsequent $1.0 million that Quinlan wired into the Escrow Account on the Debtor's behalf is treated differently; according to the PSA, it was refundable if not applied to the purchase of the Property.  Unlike the earnest money, the $1.0 million was not guaranteed to go to the Seller, and therefore is not the Seller's property.  Thus, having taken judicial notice of the Trustee's statement is irrelevant to the issue in the suit at bar.

party and specifying the terms and conditions on which the third party is required to deliver the funds." *Affiliated Computer Sys., Inc. v. Sherman (In re Kemp)*, 52 F.3d 546, 551 (5th Cir. 1995) (emphasis added).

Here, the PSA contained a clear and definite section entitled "Escrow Agreement," which directed that funds be deposited with a third party—specifically, the Title Company; the PSA also specified the terms and conditions on which the Title Company was required to deliver the funds. [Finding of Fact No. 2]; [Def's Ex. No. 10]. Accordingly, the PSA not only created the Escrow Account, but the Escrow Agreement section contained therein controls the disposition and characterization of funds within the Escrow Account.

> 3. <u>The PSA Governs Whether the $1.0 Million is Property of the Chapter 7 Estate</u>

Because the PSA created the Escrow Agreement, which directs the disposition of funds within the Escrow Account, the PSA controls the disposition of the $1.0 million. Nevertheless, in his Motion for Partial Summary Judgment, Quinlan raises several arguments asserting that this Court should reject the PSA as the controlling source of the Debtor's interest in the $1.0 million. The Court disagrees for the reasons set forth below.

### a. **The Terms of the PSA Bind Quinlan**

First, Quinlan points out in his Motion for Partial Summary Judgment that the PSA is an agreement entered into between the Debtor, the Seller, and the Title Company. Quinlan therefore contends that he cannot be bound—and the $1.0 million cannot be governed—by a contract to which he is not a party. *See City of Houston v. Williams*, 353 S.W.3d 128, 146 (Tex. 2011) (holding that absent a clear showing of intent otherwise, parties contract only for themselves); *MCI Telecomms. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 651–52 (Tex. 1999) (same).

11

This Court disagrees.  In construing a written contract, the Court's primary concern is to determine the true intent of the contracting parties as expressed in the contracting instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).  Here, it seems clear that the Debtor and Quinlan intended to incorporate the PSA into their own agreement—the JVA.  After all, the JVA expressly referenced the PSA's terms.  [Def.'s Ex. No. 10] ("[The Debtor] has entered into a certain Agreement of Purchase and Sale [*i.e.*, the PSA] dated effective as of November 28, 2011 . . . by and between AFIS and WELLS FARGO BANK, N.A. . . . ").  Because Quinlan did sign the JVA [Finding of Fact No. 10], he had knowledge of the PSA and at least impliedly accepted the PSA's terms.  *See Gray & Co. Realtors, Inc. v. Atl. Hous. Found., Inc.*, 228 S.W.3d 431, 436 (Tex. Ct. App. 2007) (quoting *Castroville Airport, Inc. v. City of Castroville*, 974 S.W.2d 207, 211 (Tex. Ct. App. 1998) ("[C]ontracting parties are obligated to protect themselves by reading what they sign and are presumed, as a matter of law, to know the contract's terms.")).

> **b. Quinlan May Have Been Able to Rescind the JVA for Failure of Consideration, But He Did Not Do So Within a Reasonable Time; the JVA Was Therefore a Valid and Enforceable Contract As of the Date of the Filing of the Bankruptcy Petition.**

Second, Quinlan argues that after the Debtor and he agreed to the JVA, there was a total failure of consideration by the Debtor because the Debtor's promise of performance failed. When the Debtor and Quinlan entered into the JVA, they established that Quinlan would deposit $1.0 million into the Escrow Account contemplated in the PSA.  [Finding of Fact No. 10].  In exchange, the Debtor promised to form Summerlin Properties, LLC for the purpose of purchasing the Property, and to assign the Contract to Summerlin upon the sale of the Property. *Id.*  Quinlan argues that when the Fourth Amendment to the PSA fell through [Finding of Fact No. 9], the Debtor failed—in full—to provide the promised performance.

Consideration is a fundamental element of every valid contract, *Fed. Sign v. Tex. S. Univ.*, 951 S.W.2d 401, 408 (Tex. 1997), and courts have long recognized that a promise itself can be sufficient consideration to create a binding contract. *See, e.g., Goins v. Ryan's Family Steakhouses, Inc.*, 181 Fed. App'x. 435, 437 (5th Cir. 2006) ("Under Texas law, a contract must be supported by consideration—that is, 'a present exchange bargained for in return for a promise'"); *Gulf Liquid Fertilizer Co. v. Titus*, 354 S.W.2d 378, 385 (1962); *Muller v. Riviere*, 59 Tex. 640 (1883). As long as the bargained-for promise "includes something that is not within the requirements of a preexisting duty, the law of consideration is satisfied." *Goins*, 181 Fed. App'x at 437; *Cechettini v. Consumer Associates, Ltd.*, 260 Cal. App. 2d 295, 298 (Cal. Ct. App. 1968). "A promise is a good consideration for a promise. And it is so previous to performance and without performance." *Hudson v. Browning*, 264 Mo. 58, 65 (Mo. 1915); 2-5 Corbin on Contracts § 5.4. The promise must simply induce the parties to incur a detriment. 2-5 Corbin on Contracts § 5.8.

The Debtor undoubtedly gave Quinlan consideration at the time the contract was created. *See* [Finding of Fact No. 10]. The Debtor was not under a pre-existing duty to form a single purpose entity (i.e., Summerlin Properties, LLC) for Quinlan's benefit. After Quinlan and the Debtor executed the JVA, Quinlan performed by wire-transferring the $1.0 million [Finding of Fact No. 12]; however, the Debtor did not perform by forming Summerlin and assigning the Property to this entity. Nevertheless, the Debtor's good faith promise at the time it executed the JVA was not made illusory simply by its subsequent failure; therefore, there is not a lack of consideration.

Granted, once a contract is formed, failure of consideration can subsequently be grounds for rescission. *Pagosa Oil and Gas, L.L.C. v. Marrs and Smith Partnership*, 323 S.W.3d 203

(Tex. Ct. App. 2010). "Generally, failure of consideration occurs when, because of some supervening cause after an agreement is reached, the promised performance fails." *Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 320 (Tex. Ct. App. 2003). Failure of consideration can be either partial or total. *River Prod. Co. v. Webb (In re Topco, Inc.)*, 894 F.2d 727, 742 (5th Cir. 1990) (citations omitted). Either way, rescission requires that the failure be substantial. *Estate of Menifee v. Barrett*, 795 S.W.2d 810, 815 (Tex. Ct. App. 1990).

Quinlan argues that the JVA failed as a result of a total failure of consideration, and that he can rescind it, citing *Food Machinery Corp. v. Moon*, 165 S.W.2d 773 (Tex. Ct. App. 1942) to support his reasoning. In that case, Food Machinery (FM) entered into a contract with Carroll Moon (Moon) for FM to drill an irrigation well on Moon's property. *Id.* at 774. In return, Moon agreed to pay FM for its services. When the well eventually failed and FM abandoned the project, Moon refused to pay. *Id.* The *Food Machinery* court excused Moon's payment, finding that because of the well's supervening failure, Moon received "nothing whatever of value in exchange for property or money." *Id.* As FM's consideration failed, Moon was permitted to rescind the contract. *Id.*

Applying these foregoing facts to the Debtor, Quinlan argues that in exchange for the $1.0 million, the Debtor agreed to "form a single purpose entity [i.e., Summerlin Properties, LLC] to acquire the [Seller's] property." [Finding of Fact No. 10]. The supervening failure of the Fourth Amendment to the PSA made it impossible for the Debtor to form such an entity and acquire the Property. [Finding of Fact Nos. 9 & 13]. Accordingly, as Quinlan did not—and could not—receive the consideration promised in exchange for the $1.0 million, the Debtor's consideration for the JVA failed.

The Court agrees with Quinlan's conclusion; the supervening event between the Seller and the Debtor—i.e., the Seller's refusal to execute the Fourth Amendment to the PSA—did indeed make it impossible for the Debtor to perform under the JVA, which resulted in a failure of consideration. *See Food Machinery Corp.*, 165 S.W.2d at 775. This substantial failure gave Quinlan *grounds* to rescind the JVA. *See Matter of Topco, Inc.*, 894 F.2d 727, 742 (5th Cir. 1990) (interpreting *Food Machinery Corp.*'s holding to state that a failure of consideration is grounds for rescission); *State Bank & Trust Co. of Beeville v. First Nat. Bank of Beeville*, 635 S.W.2d 807, 809 (Tex. Ct. App. 1982) (same); *Cheung-Loon, LLC v. Cergon, Inc.*, No. 05-10-01171-CV, 2012 WL 1678105 (Tex. Ct. App. May 15, 2012) (same). *But see Parsley v. Rowley*, No. B14-90-01040-CV, 1992 WL 45791 (Tex. Ct. App. Mar. 12, 1992) (interpreting *Food Machinery Corp.* to hold that rescission is automatic).

The weakness in Quinlan's argument, however, is that even if consideration for the JVA failed, Quinlan failed to take any action to rescind the JVA. To rescind the JVA, Quinlan had to take some affirmative step after the Debtor failed to fulfill his promise, and that step had to be taken within a reasonable time. *See Marsh v. Orville Carr Associates, Inc.*, 433 S.W.2d 928, 931 (Tex. Civ. App. 1968) (holding that a person may rescind a contract by either a formal agreement or by his course of conduct); *Shafer v. Gulliver*, No. 14-09-00646-CV, 2010 Tex. Ct. App. LEXIS 9021 (Tex. Ct. App. Nov. 12, 2010) (same).

By definition, a "reasonable time" for action is case and fact specific. *Compare Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 344 (Tex. 2011) (finding that rescission within days after grounds to rescind were established and prior to litigation was reasonable), *with In re Kealoha*, 2 B.R. 201, 215 (Bankr. D. Haw. 1980) (finding that rescission after litigation began, *and* over one year after grounds to rescind were established was

unreasonable); *In re Schick*, 232 B.R. 589, 596 (Bankr. S.D.N.Y. 1999) (failing to rescind until two years after grounds for rescission established and after litigation began was unreasonable); *In re Domestic Fuel Corp.*, 79 B.R. 184, 196 (Bankr. S.D.N.Y. 1987) (finding that rescission fourteen months after grounds to rescind was unreasonable).  In the suit at bar, the Court finds that Quinlan failed to act within a reasonable time.  The Debtor and Wells Fargo failed to actually enter into the Fourth Amendment to the PSA on April 30, 2012. [Finding of Fact Nos. 9 & 13].  Almost two months later (i.e., on July 11, 2012), Quinlan filed his initial complaint in this adversary proceeding.  [Finding of Fact No. 20].  In that complaint, Quinlan did not allege or raise the issue of failure of consideration and did not seek to rescind the JVA.  *See* [Adv. Doc. No. 1].  Rather, the first time that Quinlan made this argument was on November 6, 2012, in a hearing before this Court.  [Adv. Doc. No. 64].  Thus, Quinlan did not seek to rescind the JVA until almost four months after litigation had commenced, and until almost seven months after the potential grounds for rescission arose.

Under these circumstances, the Court concludes that Quinlan failed to attempt to rescind the JVA within a reasonable time.  Thus, at the time of the Debtor's bankruptcy filing (i.e., on April 30, 2012), the JVA remained valid and in effect.  Accordingly, the Court's conclusion above continues to apply: that the JVA, which references the PSA's terms, was a valid and enforceable agreement at the time of the Debtor's bankruptcy filing.

### c.  Because Quinlan Failed to Timely Rescind the JVA, the Terms of the PSA Govern the $1.0 Million in Escrow

Because Quinlan failed to timely rescind the JVA, under Texas law, the $1.0 million remains subject to the terms of the Escrow Agreement contained within the PSA.  Texas escrow law provides that a party who deposits funds in escrow relinquishes control over those funds. *See Day v. Townsend*, 238 S.W. 213, 215 (Tex. Comm'n App. 1922, holding approved); *Cutbirth v.*

*Snowden*, 252 S.W.2d 477, 482 (Tex. Ct. App. 1952) (citing *Day v. Townsend* and stating that "[u]nless [the depositor's] definite intention was to place the [escrowed funds] in question beyond [his or] her control why deposit same with a third party with instructions to deliver."); *see also TCC Historic Tax Credit Fund VII, L.P. v. Levenfeld Pearlstein, LLC*, No. 11-C-8556, 2012 U.S. Dist. LEXIS 167791 (N.D. Ill. Nov. 27, 2012).  Thereafter, "[t]he ultimate disposition of the subject matter . . . is determined by the terms of the agreement."  *Wilson v. United Savings of Texas (In re Missionary Baptist Foundation of America)*, 792 F.2d 502, 504 (5th Cir. 1986) (applying Texas law); *Countryman v. Estate of Eisner (In re Eisner)***,** No. 05-44474, 2007 Bankr. LEXIS 2921 (Bankr. E.D. Tex. Aug. 28, 2007).   Further, the depositary in escrow [or title company] has an "absolute duty to carry out the terms of the agreement."  *In re Missionary Baptist Foundation of America*, 792 F.2d at 504.

By depositing the $1.0 million into the Escrow Account, Quinlan agreed—impliedly, if not expressly—to the terms of the Escrow Agreement.  This act alone relinquished Quinlan's control over these funds, and the disposition of these funds became automatically subject to the terms of the PSA.  After Quinlan wire transferred the $1.0 million [Finding of Fact No. 12], the Escrow Agreement then permitted certain parties to direct the disposition of the funds [Finding of Fact No. 2].  Specifically, the Escrow Agreement directed that "[u]pon written notification from *Seller* or *Purchaser* in accordance with the terms of this Agreement, the Title Company shall release the funds in accordance with and pursuant to the written instructions."  [*Id.*] (emphasis added).  When Quinlan signed the JVA, he did not alter the disposition terms of the Escrow Agreement.  *See* [Finding of Fact No. 10].  Quinlan argues that when he deposited the $1.0 million into the Escrow Account, he reasonably believed that "the title company [i.e., Stewart Title] would return the funds to him if the Fourth Amendment [to the PSA} was not

signed." [Adv. Doc. No. 54, p. 6]. In light of Texas escrow law, however, it is unreasonable to believe that these funds would be returned. Quinlan knew—or should have known—that the express terms of the Escrow Agreement contained in the PSA destroyed his ability to have any control over the $1.0 million once these funds reached the Escrow Account.[9]

### d. Although the Fourth Amendment to the PSA was Never Signed and Executed, the PSA (As Validly Amended Three Times) Remains Operative

Quinlan next argues that the Escrow Agreement contained within the PSA cannot control the $1.0 million funds because the parties failed to agree to the PSA's amended terms; that once the Fourth Amendment to the PSA was not executed by both the Seller and the Debtor, there was no contract to govern the funds in the Escrow Account [Finding of Fact Nos. 6–9].; and that therefore the PSA does not contain a valid and enforceable Escrow Agreement.

The Court disagrees with this argument. While the Fourth Amendment to the PSA was not signed, the terms of the PSA still controlled the funds in the Escrow Account. *See* [Finding of Fact No. 2]. Although the Debtor did terminate the PSA at one point, the Debtor and the Seller subsequently reinstated it. [Finding of Fact Nos. 5 & 6]. Any modifications to the agreements—which occurred by way of the second, third and, never signed, fourth amendment—did *not* reach the Escrow Agreement. As a result, the failure of the Fourth Amendment to the PSA has no effect on the reinstated PSA. The parties agreed to the

---

[9] It is worth noting that Quinlan is a duly licensed attorney-at-law in the State of Texas. He is charged with knowing the law, including escrow law. *See Connick v. Thompson*, 131 S. Ct. 1350, 1361 (2011) (discussing in dicta that attorneys know "how to find, understand, and apply legal rules," and that they are "trained in the law and equipped with the tools to interpret and apply legal principles, understand constitutional limits, and exercise legal judgment."); *Pyramid Controls Inc. v. Siemens Indus. Automation, Inc.*, 172 F.3d 516, 519–20 (7th Cir. 1999) ("All lawyers are presumed to know the law . . . ."); TEXAS DISCIPLINARY RULES OF PROF'L CONDUCT R. 1.01 (2005) ("Because of the vital role of lawyers in the legal process, each lawyer should strive to become and remain proficient and competent in the practice of law."). *See generally Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990) ("In Texas, the law recognizes that there is no duty to inform others of the requirements of the law because all persons are presumed to know the law.").

unmodified Escrow Agreement contained within the PSA, and this agreement therefore continues to control the $1.0 million in the Escrow Account.

### e. Other Arguments Regarding the JVA Do Not Persuade this Court that the $1.0 Million Belongs Solely to Quinlan

Finally, in his Motion for Partial Summary Judgment, Quinlan argues that the Debtor (and therefore the Trustee) is in breach of the JVA by failing to create Summerlin Properties, LLC, as the sole purpose of the formation of this entity was the acquisition of the Property. Moreover, because the Debtor could only create Summerlin Properties, LLC, and assign the Contract to it upon the sale of the Property, the Debtor (and therefore the Trustee) is categorically unable to cure this breach. Therefore, according to Quinlan, as a matter of law, the Trustee (and therefore the Estate) has no interest in the $1.0 million. [*Id.*].

This Court disagrees. The JVA is not the Escrow Agreement, and the JVA does not govern the disposition of funds placed in the Escrow Account. As discussed above, the PSA (including the Escrow Agreement contained therein) governs the issue before this Court (i.e., Does the Debtor's estate have an interest in the $1.0 million in the Escrow Account?). Thus, any breach-of-contract arguments are misplaced. Because the PSA, not the JVA, determines whether the $1.0 million is property of the estate, the JVA arguments are not pertinent to this Court's analysis of the PSA.

In sum, Quinlan's arguments are without merit. By signing the JVA, Quinlan, a seasoned lawyer, accepted the terms of the PSA expressly referenced in the JVA. In accepting those terms, Quinlan knew—or should have known—that by transferring funds to the Escrow Account, he relinquished his control over their disposition. Neither the Debtor's alleged failure of consideration under the JVA, nor the unexecuted Fourth Amendment to the PSA, automatically

triggers the release to Quinlan of the $1.0 million from the Escrow Account.  The disposition of these funds is governed by the Escrow Agreement contained in the PSA.

    4.  <u>Under the Escrow Agreement Contained in the PSA, the Funds are Property of the Estate</u>

Having settled the issue of whether the PSA governs the $1.0 million—it does—the remaining issue is whether under the terms of the PSA, is the $1.0 million property of the bankruptcy estate?  Courts have fashioned a multi-factored test to determine whether funds held in escrow constitute property of the bankruptcy estate.  Ultimately, the determination "depends entirely on the nature and circumstances of the escrow agreement."  *In re Sun*, 116 B.R. 767, 771 (Bankr. D. Haw. 1990) (quoting *In re World Communications*, 72 B.R. 498, 501 (Bankr. D. Utah 1987)).  Relevant factors include:  (1) whether the debtor initiated or agreed to the creation of the escrow account; (2) whether the debtor exercises any control over the escrow account; (3) the incipient source of the escrow account; (4) the nature of funds within the escrow account; (5) the recipient of the escrow account's remainder funds (if any); (6) the targeted benefit of the escrow account; and (7) the purpose of the escrow account's creation.  *In re Sun*, 116 B.R. at 772 (quoting *In re World Communications*, 72 B.R. at 501); *see also Cedar Rapids Meats, Inc. v. Hager (In re Cedar Rapids Meats, Inc.)*, 121 B.R. 562, 567 (Bankr. N.D. Iowa 1990); *Sun v. Estate of Ticktin (In re Sun)*, 116 B.R. 767, 772 (Bankr. D. Haw. 1990) (quoting *World Communications, Inc. v. Direct Marketing Guaranty Trust (In re World Communications)*, 72 B.R. 498, 500 (D. Utah 1987)); *Anderson County Bank v. Newton (In re All Chemical Isotope Enrichment, Inc.)*, 127 B.R. 829, 837–38 (Bankr. E.D. Tenn. 1991).

### a.   Whether the Debtor Initiated or Agreed to the Creation of the Escrow Account

Here, the Escrow Agreement was entered into among the Debtor, the Seller, and the Title Company.   [Finding of Fact No. 2].   Notably, Quinlan was *not* a party to the agreement. [Finding of Fact Nos. 1–9].   Because the Debtor both initiated and agreed to the creation of the Escrow Account [Finding of Fact Nos. 1–2], the first factor therefore weighs in favor of finding that the $1.0 million in escrow is property of the bankruptcy estate.

### b.   Whether the Debtor Exercises Any Control Over the Escrow Account

Similarly, the second factor—regarding the degree of control the Debtor has over the Escrow Account—weighs heavily in favor of finding that the $1.0 million is property of the estate.   When Quinlan deposited the $1.0 million into the Escrow Account, he relinquished control over the funds, and their disposition was thereafter controlled by the terms of the Escrow Agreement.  *See* [Finding of Fact No. 2]; *In re All Chemical Isotope Enrichment, Inc.*, 127 B.R. at 838 ("When property is delivered in escrow the depositor loses control over it . . . .").   And, pursuant to the Escrow Agreement, *only* the Debtor or the Seller could direct disposition of the funds.   [Finding of Fact No. 2].   Thus, by wiring funds into the Escrow Account, Quinlan not only relinquished his control over the funds, but subjected them to the control of the Debtor.

### c.   The Incipient Source of the Escrow Account

The third factor weighs against the Debtor's estate having an interest in the escrow funds because Quinlan himself was the "incipient source" of the funds.   Even if placed in the Escrow Account "on behalf of" the Debtor, there is no dispute that Quinlan was the sole source of the $1.0 million.   [Finding of Fact No. 12].

#### d.   The Nature of Funds Within the Escrow Account

The fourth factor regarding the nature of the funds placed into the Escrow Account weighs in favor of the estate having an interest in the escrowed funds. This is because Quinlan deposited funds into the Escrow Account "on behalf of" the Debtor, with no qualifications, limitations, restrictions, or reservations of any kind. [Finding of Fact No. 12].

#### e.   The Recipient of the Escrow Account's Remainder Funds (if any)

The fifth factor concerns the recipient of any remainder of the escrowed funds. Here, the Escrow Agreement did not address the issue of who would receive any remainder. *See* [Finding of Fact No. 2]. Thus, any remaining funds would be disposed of the same way as any other funds in the account—upon written notification from either the Debtor or the Seller, in accordance with the terms of the PSA. [*Id.*]. Because the Debtor had the ability to determine the recipient of any remainder of the escrowed funds, this factor also weighs in favor of finding that the $1.0 million is property of the Debtor's estate.

#### f.   The Targeted Benefit of the Escrow Account

The sixth factor, regarding the target of the escrow's benefit, again weighs in favor of finding that the $1.0 million is property of the Debtor's estate. Certainly, Quinlan was *not* the target of the escrow's benefit, as there is no evidence to show that the parties even contemplated Quinlan when entering into the PSA containing the Escrow Agreement. Quinlan was not a party to the PSA; the PSA was entered into five months prior to the JVA [Finding of Fact Nos. 1 & 10]; and Quinlan and the Debtor never attempted to make any changes to the PSA's terms when they created the JVA.[10] [Finding of Fact No. 10]. As for the $1.0 million itself, the Debtor was

---

[10] Of course, for Quinlan and the Debtor to have made any changes to the PSA's terms, they would have needed to obtain the consent of Wells Fargo and Stewart Title, as these two entities (in addition to the Debtor) signed the PSA. There is no evidence in the record that Quinlan and the Debtor ever requested Wells Fargo and Stewart Title to modify the PSA at any time.

the target of its benefit given that Quinlan's wire transferring the $1.0 million to the Escrow Account was, as the JVA explicitly stated, made "on behalf of" the Debtor.  [Finding of Fact No. 12].

### g.  The Purpose of the Escrow Account's Creation

The final factor to consider is the purpose of the creation of the Escrow Account.  The purpose of the Escrow Account here is the same as that of any escrow account created in connection with a purchase and sale agreement; namely, to protect the parties to the agreement. *Vector Industries, Inc. v. Dupre*, 793 S.W.2d 97 (Tex. Ct. App. 1990).  The Escrow Account ensures that if the contemplated purchase and sale does not close, the Seller will not receive the funds; rather, they will go to the Debtor.  Quinlan, however, was not a party to the Escrow Agreement, nor did the Seller and the Debtor create the Escrow Account with any purpose to protect Quinlan's interests.  *See* [Finding of Fact Nos. 1–9].  Therefore, the intended recipient of the funds should the sale fail to close is the Debtor (i.e., now the Debtor's Chapter 7 estate), not Quinlan.

Overall, six of the seven factors articulated in *Sun* indicate that the $1.0 million is property of the Debtor's estate.  Only the third factor weighs in Quinlan's favor.  As a result of this analysis, the Court concludes the Debtor held title to the $1.0 million at the time of its filing for bankruptcy.  And, when the Debtor declared bankruptcy, the Debtor's estate also received the same interest in this $1.0 million as the Debtor had when it filed its petition.  *See* 11 U.S.C. § 541(a) (defining property of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case . . . wherever located and by whomever held.").  The Court therefore concludes that the $1.0 million is property of the Debtor's Chapter 7 estate.

## IV. Conclusion

Quinlan had at least two opportunities to preserve his interest in the $1.0 million: (1) prior to signing the JVA, he could have negotiated a modification to the PSA's Escrow Agreement terms so that if the Fourth Amendment to the PSA was not executed, the $1.0 million would automatically be returned to him; and (2) after the Seller failed to agree to and execute the Fourth Amendment to the PSA, Quinlan could have timely rescinded the JVA for a failure of consideration. As Quinlan did neither, this Court is left looking to the terms of the Escrow Agreement contained in the reinstated PSA to determine whether the $1.0 million is property of the estate. And, under the multi-factored *Sun* test, the Court concludes that the $1.0 million is, indeed, property of the Debtor's Chapter 7 estate.[11]

For all these reasons, this Court concludes that Quinlan's Motion for Partial Summary Judgment should be denied in its entirety and the Trustee's Counter-Motion should be granted in its entirety.

An Order consistent with these findings and conclusions will be entered on the docket simultaneously with the entry of this Memorandum Opinion.

Signed on this 7th day of February, 2013.

Jeff Bohm
Chief United States Bankruptcy Judge

---

[11] This conclusion necessarily means that Quinlan has a claim against the Debtor's estate for the Debtor's failure to fulfill the promise that it made to Quinlan in the JVA.